UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

WESLEY EUGENE BROOKS,                          CIVIL NO. 12-316 (SRN/JSM)

      Plaintiff,

v.                                             REPORT AND RECOMMENDATION

TOM ROY, et al.,

      Defendants.

JANIE S. MAYERON, United States Magistrate Judge

The above matter came on before the undersigned upon plaintiff's Motion for Temporary Restraining Order or Preliminary Injunction [Docket No. 16].

This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation by the District Court pursuant to 28 U.S.C. § 636(b)(1)(A), (B) and Local Rule 72.1(c).   Karin Ciano, Esq. and F. Clayton Tyler, Esq. appeared on behalf of plaintiff.   Angela Behrens, Minnesota Assistant Attorney General, appeared on behalf of defendants.

## I.    INTRODUCTION

Plaintiff Wesley Eugene Brooks ("Brooks") is currently incarcerated at Minnesota Correctional Facility ("MFC-Faribault") located in Faribault, Minnesota.   Brooks asserts in the instant suit that the chemical dependency treatment program that he had been mandated to attend by the Minnesota Department of Corrections ("MDOC") required him to participate in and practice a twelve-step program, which he claims conflicts with his Native American religious faith.   See Complaint [Docket N. 1], ¶¶ 20, 21, 23.   Brooks asked to be allowed to seek treatment at his own expense in a culturally appropriate Native American chemical dependency treatment program that is available at the

Mash-ka-wisen Primary Residential Treatment Center ("Mash-ka-wisen") located in Sawyer, Minnesota.[1]  Id., ¶ 24.   His request was denied.   Id., ¶ 25.

Brooks commenced this suit alleging claims against defendants under 42 U.S.C. § 1983 for a violations of his First Amendment right to free exercise of religion, the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. § 2000cc-1, the American Indian Religious Freedom Act ("AIRFA"), 42 U.S.C. § 1996, and the Minnesota Constitution, Art. I, § 16.   Id., ¶¶ 31-42.   In his prayer for relief, Brooks seeks injunctive relief in the form of prohibiting defendants from violating his right to freely practice his religion, directing defendants to relieve him from participating in any twelve-step program, and allowing him to obtain treatment at the Mash-ka-wisen with the same release date, prison privileges, benefits and good time credit he would have received had defendants allowed him to participate at the program when he initially requested this accommodation.   Id., p. 10.

Following commencement of this suit, Brooks was terminated from the FMC-Faribault chemical dependency program for non-compliance with the program. See Affidavit of Jennifer Nemecska[2] ("Nemecska Aff."), Ex. 7.

In the matter presently before the Court, pursuant to Rule 65 of the Federal Rules of Civil Procedure, Brooks seeks a temporary restraining order, or in the alternative, a preliminary injunction directing defendants to return him to the New Dimensions Chemical Dependency Treatment Program ("New Dimensions Program") at MFC-Faribault; enjoining defendants from restricting his right to freely participate in the Native American

---

[1]      Sawyer, Minnesota is located approximately 190 miles from FMC-Faribault.

[2]      Nemecska is a Clinical Program Therapist for the MDOC, a licensed drug and alcohol counselor, and a licensed professional clinical counselor.   See Nemecska Aff., ¶ 1.   Nemecska was Brooks' primary therapist at the New Dimensions Program.   Id., ¶ 2.

religion; enjoining defendants from disciplining him for his inability to fully participate in the New Dimensions Program; and enjoining defendants from retaliating against him for filing this action.   See Motion for Restraining Order or Preliminary Injunction [Docket No. 16], p. 1.

## II.    FACTUAL BACKGROUND

Brooks currently resides at MFC-Faribault, where he is a serving a 72-month sentence resulting from four convictions, including three convictions for first-degree driving while intoxicated ("DWI") and a conviction for assaulting an officer because he "flicked" urine in the face of an police officer while he was providing a urine sample.   See Affidavit of Wesley Eugene Brooks ("Brooks Aff."), ¶¶ 3, 4; Second Affidavit of Kobie K. Hudson ("Hudson Aff."), ¶ 3, Ex. 1.   During the stops leading to these convictions, marijuana, drug paraphernalia and packaging with trace amounts of cocaine were also discovered.   Hudson Aff., ¶ 3, Ex. 1.   Brooks has a past criminal history for DWIs and multiple felony offenses related to controlled substances.   Id.   When Brooks entered the MDOC, he was assessed as to whether any treatment was appropriate.   Based on the fact that Brooks had an outstanding treatment requirement from his previous incarceration and because his offense involved alcohol, MDOC staff determined that he had a high need to participate in treatment.   Brooks Aff., ¶ 5; Nemecska Aff., ¶ 6.

On November 14, 2011, Brooks began his treatment with the New Dimensions Program at MFC-Faribault.   Brooks Aff., ¶ 6; Nemecska Aff., ¶ 7.   New Dimensions is a chemical dependency treatment program created in conjunction with the Hazelden treatment program, which uses evidence-based practices such as cognitive behavior therapy to help reframe cognitive distortions.   Nemecska Aff., ¶ 4.   During a typical week, offenders in the program have group therapy every day for two hours, except on

Tuesdays; offenders meet on an individual basis with therapists, as needed, to assess treatment planning; offenders are encouraged to arrange additional individual therapist meetings when needed; and offenders participate on a daily basis in two-hour large lectures during which psycho-education occurs regarding drug education, criminal and addictive thinking, release and reintegration, socialization, values and other topics.  Id. In assessing a client's progress, therapists conduct a monthly review looking at the "progress in treatment, the client's attitude toward treatment, the client's openness to addressing treatment barriers and problems, the client's willingness to identify the existence of a drug and crime issue, and how willing the client is to change and become a productive member of society."  Id., ¶ 5.  The program uses a "stages of a change" model to determine a client's current state as to their progress, which includes: "1) the pre-contemplation stage, in which the client views that nothing needs to change; 2) the contemplation stage, in which the client believes maybe there is something that needs to change; 3) the preparation stage, in which the client is deciding that he will make a change; 4) the action stage, in which the client is making the change and believes he will be successful; 5) the maintenance stage, in which the client is making changes and plans to stick with the changes; and 6) the termination stage, in which the changes are ingrained in the client's behavior."  Id.

During his first weeks in the New Dimensions Program, Brooks used his assignments to complain about the lack of a treatment program specific to Native Americans, as opposed to focusing on treatment to deal with his chemical dependency problems.  Id., ¶ 7.  He repeatedly asserted that he did not believe in addiction and had already made the needed changes without treatment.  Id.  On November 30, 2011, Brooks was directed to complete a comprehensive self-assessment questionnaire to

assist him and his therapist in developing an individualized treatment plan related to his drug and alcohol use.   Id.   Brooks answered most of the questions with "N/A" and the form was returned to him due to insufficient reporting.   Id.   In a revised  questionnaire dated December 30, 2012,[3] Brooks refused to answer many of the questions, asserting that they were not relevant or applicable.   Id., ¶ 7, Ex. 2.   In response to the question as to whether he believed he had a drug or alcohol problem, Brooks replied, "No don't believe in drug/alcohol problems."   Id., Ex, 2, p. 8.   In terms of what he wanted to get out of the treatment program, Brooks replied, "change program for Native Americans."   Id. Brooks also represented that he had never relapsed as to any drug or alcohol.   Id., p. 9. As to his concerns about completing the treatment program, Brooks asserted, "your believes [sic] aren't mine and never will be."   Id., p. 13.

In addition, on November 30, 2011, Brooks prepared a "thinking report" as a part of his treatment assignments, in which he listed the event of "trying to change someones [sic] spiritual/moral/religious beliefs."   See Brooks Aff., Ex. C [Docket No. 19-1, p. 7 of 25].   His proposed behaviors to address this event were to "(1) point out how its [sic] wrong; (2) answer things honestly; (3) tell them that not all cultures are same."   Id.   His listed core beliefs were to stand up for himself, stand up for his culture and be strong.   Id. His tactics included being "deliberately vague," "false compliance," and "playing dumb." Id., p. 8 of 25.   In summary, Brooks stated that it is "wrong to try to change peoples [sic] believes [sic]."   Id.

In a thinking report dated December 3, 2011, Brooks addressed the day he was asked to move to the treatment program.   Id., p. 5 of 25.   He described his thoughts as

---

[3]    This Court notes that the assessment was reviewed with Brooks on December 30, 2011 and is signed by Brooks and Nemecska on January 13, 2012.   See Nemecska Aff., Ex. 2, p. 13.

trying to get a new program for Native American people into MDOC; under the section entitled "Alternative thoughts" he referenced the existing MDOC policy for "native program;" under the "Alternative behavior" section, he stated he did not believe in alcoholism and chemical dependency.   Id.   In another thinking report dated December 3, 2011, Brooks listed the event to address as "[b]eing told to sign out of treatment because of my RELIGIOUS/MORAL/SPIRITUAL BELIEFS on three different occasions by treatment staff."   Id., p. 3 of 25.   His thoughts were that "[w]hy should anyone believe in program that tells you to have a [sic] open mind to something you and your culture don't believe in[;] Genocide by assimilation[;] It is ILLEGAL."   Id.   Brooks stated his core beliefs were to help other people understand that other cultures have different beliefs, to stand up for his beliefs, and to help the weak.   Id.   Id., p. 4 of 25.   In summary, Brooks noted that people get upset when one believes differently than they do, and when one stands up for themselves and their culture.   Id.

In a thinking report dated December 5, 2011, Brooks addressed the following event, "[h]aving therapist try to punish me into submission.   After doing 2 thinking reports was told to do both over after redoing was put on table.   So after 4 thinking reports have to do 2 more for a total of Six.   So four extra.   Was told they were important but not told why."   Id., p. 9 of 25.   Brooks stated that he was "having flashbacks of what my elders described happened to them in Catholic schools," and that he was going to "keep doing what is right."   Id.   Brooks indicated that he would not be submissive, he would not lie to make "them" happy, and he would not quit or sign out of the program.   Id., p. 10 of 25. Brooks noted that therapists were trying to sound like they were helping him, were using power to make him do things a certain way, and were using deceit to make him believe that everyone can benefit from the program.   Id., p. 11 of 25.

On December 5, 2011, Brooks noted in his journal that he had been placed on the decision table,[4] which taught him that if he tried to handle a problem properly he would be punished.  See Brooks Aff., ¶ 15, Ex. F.   Brooks also stated that he had state statutes supporting his side and thanked the therapist "for these lies in morals. They are very helpful."  Id.

In a case consult and supervision note dated December 14, 2011, it was reported that Brooks was quick to resist with vague answers or arguments when asked to provide treatment requirements, including thinking reports, pro-social requirements and self-assessment forms.  See Nemecska Aff., Ex. 3, p. 1.  Brooks had also created chaos at a community meeting by holding himself accountable for being placed at the "decision table," but at the same time stating that he did not know what he had done wrong with regards to his thinking reports.  Id.  It was also noted that Brooks had a tendency to undermine staff and treatment policies.   Id.

In a comprehensive assessment summary conducted by staff dated January 4, 2012, it was reported that Brooks had been resistant to treatment.  Id., Ex. 3, pp. 2, 3.  It was noted that Brooks had stated that "I don't believe in addiction, my culture doesn't even have a word for it," and "I don't believe in relapse."  Id.  Staff believed that Brooks was in the pre-contemplation state of change, given he did not believe in addiction or relapse.  Id., p. 3.  According to staff, Brooks "would benefit from developing pro-social networks that strongly support the Native American Culture. . . ."  Id.  Staff believed that

---

[4]      The decision table is a form of intervention and refers to a room near the corrections officer's desk where clients are placed for behavioral problems, such as a negative attitude, disruptive behavior, or an unwillingness to engage in the treatment process.  See Nemecska Aff., ¶ 19.  A client has an opportunity to work in the room, away from his primary group, to think about his behavior and work on assignments that are designed to help him identify the problem behavior.  Id.  When the client continues to exhibit the identified problem behavior, he may be again placed on the decision table. Id.

because of his lack of understanding of relapse and his resistance to treatment, Brooks had a high probability for further substance abuse.   Id.

In a Monthly Treatment Plan Review dated January 14, 2012, staff noted that Brooks continued to be at the pre-contemplation stage of his therapy, as evidenced by his statement that "I don't have any problems with drugs and alcohol."   Id., p. 5.   Brooks still showed signs of resisting treatment by not participating in primary group and large group lectures.   Id.   He had participated in a community meeting by condoning the negative behavior of one of his peers.   Id.   Brooks told staff he did not like not being able to express his opinions in the program and would not give any feedback in order to avoid getting into trouble.   Id.   Staff believed that Brooks would benefit from opening up to the treatment process.   Id.

On February 7, 2012, Brooks filed the present Complaint, which was served on defendants between February 9-15, 2012.   See Docket Nos. 1-8.   On the same day, Brooks inquired in an Offender Kite Form[5] about being transferred to a Native American treatment center.   See Brooks Aff., Ex. E, p.1.   Staff responded that FMC-Faribault had ample treatment supports to meet his needs, including the Red Road and White Bison which are alternative treatment plan options that are culturally specific to Native Americans.   Id., Nemecska Aff., ¶ 9.   On February 21, 2012, Brooks sent another Offender Kite Form stating that Red Road and White Bison were not treatment programs and were not even available at the New Dimensions Program.   See Brooks Aff., Ex. E, p.

---

[5]      A kite is "a printed form issued by the department that offenders use to communicate with staff (e.g., ask questions, communicate concerns, request a special visit, request for program information, request for information to transfer, etc.).   A kite form can be used to request appointments, information, programming, or to informally resolve an issue."   MDOC Policy 303.100, effective 8/3/10, http://www.doc.state.mn.us/DocPolicy2/html/DPW_Display_TOC.asp?Opt=303.100.htm.

2.   In response, staff noted that Red Road and White Bison were not treatment programs, but rather were cultural specific supports that could be incorporated into treatment.   Id.; see also Nemecska Aff., ¶ 9.   It was reiterated that Brooks had not availed himself of these supports.   See Brooks Aff., Ex. E, p. 2.   Staff explained that if Brooks wanted to start a Native American support group, he could do so and that materials were available for him to do so.   Id.   Staff also clarified that the New Dimensions Program was not a twelve-step program.   Id.

On February 10, 2012, it was reported by Nemecska that when Brooks was asked to participate in a group discussion on deserving sobriety, he replied that he did not believe in sobriety and that what people deserve is not up for him to decide.   See Nemecska Aff., Ex. 4, p. 2.   Brooks did participate giving a 15-minute life story, but was upset about inquiries as to the identity of his reservation.   Id.   Brooks also told Nemecska that he could not be in the same room with her.   Id.   Nemecska opined that Brooks was in the pre-contemplation stage of his therapy, he continued to resist treatment and was not moving forward.   Id.

Brooks noted on February 10, 2012, that he had a good day except for being told that he was the primary reason why group therapy was not running right.   See Brooks Aff., Ex. G.   Brooks claimed, and the therapist denied, that he was told he should quit having legal visits because they were taking away from his treatment.   Id.   Brooks also stated in his journal notes that while in the New Dimensions Program he had on multiple occasions participated in Native American pipe ceremony, smudging and sweat lodge. Id., ¶ 19, Exs. H, p. 2, I.

In the Monthly Treatment Plan Review dated a February 12, 2012, staff noted that Brooks continued to be at the pre-contemplation stage of his therapy as evidenced by his

statements that "I don't have any problems with drugs and alcohol" and " I don't believe in

sobriety."   See Nemecska Aff., Ex. 4, p. 1.   At a care conference, Brooks was told that

he lacked focus in his treatment and was encouraged to motivate himself to begin working

on his recovery, to discontinue resisting treatment and to cease his negative attitude

towards treatment.   Id.   To give Brooks the opportunity to create his own cultural

specific treatment, he was given a blank treatment plan to fill out which staff indicated they

would merge into the MDOC treatment plan.   Id.   Staff also noted that Brooks would

benefit from developing an open mind about treatment.   Id.

On February 21, 2012, Brooks submitted an Offender Kite Form to Nemecska,

asking for clarification on how he was resisting treatment, whether she was trying just to

make him look bad, or had "something personal against me."   See Brooks Aff., Ex. D.

Nemecska responded that there were several ways to resist treatment including not being

open to what treatment can offer; saying that he cannot get anything out of treatment

because the program does not offer cultural specifics, despite the fact that the program

does have cultural specifics; focusing on staff behavior, instead of his own behavior; and

showing lack of effort in moving to the next stage of treatment.   Id.   Nemecska also

stated that she had nothing personal against Brooks and was not trying to make him look

bad.   Id.

On February 29, 2012, Brooks was sent to the decision table and was required to

complete an assignment.   Id., Ex. C [Docket No. 19-1, p. 12 of 25].   When asked about

what behavior caused him to be sent to the decision table, Brooks replied that it was

because he had filed a lawsuit against the program.   Id.   Brooks also noted that he was

told that he was being argumentative with staff, which he denied, and indicated that

instead of placing him in his cell immediately, he was sent to the decision table the next

day, thereby preventing him from going to a religious ceremony.   Id., pp. 12-13 of 25.

As to how his behaviors were harmful to his treatment peers and the treatment process,

Brooks asserted that his peers might be afraid to challenge therapy.   Id., p. 12 of 25.

Regarding issues he needed to address, Brooks stated he would not question anything

given to him by treatment staff, even though they interrupt him.   Id.   Brooks also denied

being rude, interrupting a staff member while she was talking, lying, being deliberately

vague, staying silent to avoid notice, playing dumb, arguing, raging, being sarcastic,

splitting staff, creating chaos or seeking attention.   Id., pp. 14-17 of 25.

On March 5, 2012, Brooks was placed on a Behavior Contract for the following

reasons:

> 1. Continue to remain in the pre-contemplation stage of change.
>
> a) Undermining and resisting the treatment process. Specifically:
>
> > • displaying challenging and argumentative behavior when asked to correct assignments.
> >
> > • seeking to engage staff into power struggles when confronted on undesirable behavior rather than focusing on own behavior.
> >
> > • disrespecting staff by labeling them with derogatory names.
> >
> > • not accepting of feedback pertaining to behavior.
>
> b) Demonstrating a lack of motivation and effort in treatment. Specifically:
>
> > • lack of investment in the treatment process and continued denial of the need for change.
> >
> > • lack of participation in group and lecture.
> >
> > • continued focus on staff rather than his treatment needs.

Nemecska Aff., Ex. 5.   Brooks signed the Contract.   Id.

As part of the Contract, Brooks acknowledged he was required to strictly follow program and institutional rules and expectations while on contract and that failure to do could result in being placed on a probation contract.   Id.

On April 11, 2012, Brooks was placed on a Probation Contract for the following reasons:

> • Unwillingness to identify problem areas and continued denial of need for change by not addressing criminal and substance use related behaviors.
>
> • Continue to present treatment assignments that are completed in a vague and superficial manner which does not reflect motivation toward change.
>
> • Not taking responsibility for chemical use and criminal activity issues.

Nemecska Aff., Ex. 6.   Brooks signed the Contract.   Id.

Again, as part of the Probation Contract, Brooks acknowledged he would be required to strictly follow program and institutional rules and expectations while on contract and that failure to do could result in him being terminated from the program.   Id.

On April 19, 2012, Brooks was issued a Notice of Suspension Pending Termination, informing him that the treatment team was suspending his treatment pending termination from the New Dimensions Program.   See Nemecska Aff., Ex. 7. Brooks was given the following reasons for the decision:

> • Was placed on behavioral contract on 3/5/12 and probation contract on 4/11/12 for failure to adequately meet all of the contract expectations and remaining in pre-contemplation stage of change.
>
> • While on probation contract he continued to engage[ ]in inappropriate behaviors[,] specifically staff splitting on two separate occasions.

Id.

In a MDOC Incident Report dated April 20, 2012, staff described the staff splitting incidents referenced in the Notice of Suspension.  Id., p. 3.  On April 19, 2012, an offender approached a staff member to ask if he could make a photocopy of a treatment assignment by Brooks.  Id.  When asked why the offender was involved in getting a photocopy for Brooks and why Brooks was not going to his own therapist for the copy, the offender responded that Brooks asked him to get a copy because Brooks did not get along with his therapist and she returned his stuff with instructions.  Id.  The staff member told the offender that he could not make copies for Brooks and that Brooks needed to turn in his assignment to his therapist as directed.  Id.  It was also noted that Brooks was already going to be placed on the decision table on this date for staff splitting behaviors which occurred earlier in the week involving Brooks.  Id.  At that time, he had received an assignment to complete with specific instructions and he showed resistance to completing it and turning it into his primary therapist.  Id.  Brooks then approached another staff member, who was not his primary therapist, with the same assignment and asked, "what do you make of this" and was again given specific instructions on how to complete the assignment.  Id.  Staff determined that Brooks was engaging in staff splitting as an avoidance tactic.  Id.  Brooks was directed to the decision table and notified that he was suspended from treatment pending termination due to violating his Probation Contract.  Id.

In his appeal of the suspension, Brooks claimed that his mentor asked if he needed any help and he stated that he needed a copy of his assignment to be made so he could turn it in.  See Nemecska Aff., Ex. 7, p. 2.  The mentor told Brooks that he could not do it and then Nemecska came and told him to follow her and he was placed at the

decision table.  Id.  Brooks stated that if his appeal was accepted, he would be more aware of the proper procedures and would avoid going to a mentor with anything except how to do assignments or unless otherwise directed.  Id.  He also noted that he would only get copies from his therapist or wait until he could make copies in the library.  Id.  In addition, Brooks indicated that he would not talk to another therapist unless directed to do so or in large group.  Id.

Plaintiff was terminated from the New Dimensions Program on April 23, 2012.

At the hearing on the motion for a temporary restraining order, Brooks' counsel stated the Brooks wanted to return to the New Dimensions Program, while at the same time, seeking to preclude staff from disciplining him for refusing treatment during the pendency of the suit.  In short, Brooks wants to be restored back into the New Dimensions Program, while not being required to comply with the program's directives to the extent they conflicted with his religious beliefs.

Following the hearing, Brooks' attorney informed the Court that Brooks had notified counsel that on April 25, 2012, he had been placed in 23-hour lockdown "solely because he was removed from treatment, and not for any other infraction."  April 26, 2012 letter from Karen Ciano to the Court.

## II.   STANDARD OF REVIEW

"When evaluating whether to issue a preliminary injunction [or a TRO],[6] a district court should consider four factors: (1) the threat of irreparable harm to the movant; (2) the

---

[6]   Courts in the Eighth Circuit apply the same standards to a request for a preliminary injunction and temporary restraining order.  See S.B. McLaughlin & Co. v. Tudor Oaks Condo. Project, 877 F.2d 707, 708 (8th Cir.1989) (affirming the district court's application of the Dataphase factors to a motion for a temporary restraining order); Jackson v. Nat'l Football League, 802 F. Supp. 226, 229 (D. Minn. 1992) (concluding that the Dataphase factors apply to requests for temporary restraining orders and preliminary injunctions) (citations omitted).

state of the balance between this harm and the injury that granting the injunction will inflict on other parties; (3) the probability that the movant will succeed on the merits; and (4) the public interest."  Roudachevski v. All-American Care Centers, Inc., 648 F.3d 701, 705 (8th Cir. 2011) (citing Dataphase Sys., Inc. v. C L Sys., Inc., 640 F.2d 109, 114 (8th Cir. 1981) (en banc)).   "None of these factors by itself is determinative; rather, in each case the four factors must be balanced to determine whether they tilt toward or away from granting a preliminary injunction."  West Pub. Co. v. Mead Data Cent., Inc., 799 F.2d 1219, 1222 (8th Cir. 1986), cert. denied, 479 U.S. 1070 (1987) (citation omitted). Injunctive relief is an extraordinary remedy and the movant has the burden of establishing the propriety of an injunction.  See Roudachevski, 648 F.3d at 705 (citing Watkins, Inc. v. Lewis, 346 F.3d 841, 844 (8th Cir. 2003)); see also Gelco Corp. v. Coniston Partners, 811 F.2d 414, 418 (8th Cir. 1987) (finding that the movant "bore the complete burden of proving that a preliminary injunction should be granted.") (citation omitted).   The burden is especially heavy where, as in this case, the moving party seeks not to maintain the status quo, but to obtain relief similar to that which it could obtain after a trial on the merits. See Sanborn Mfg. Co. v. Campbell Hausfeld/Scott Fetzer Co., 997 F.2d 484, 486 (8th Cir. 1993) (citation omitted).

## III.    ANALYSIS

### A.    Threat of Irreparable Harm

According to Brooks, the threat of irreparable harm in this case is as follows:

> Because of this lawsuit, and because of the problem the lawsuit seeks to remedy — Plaintiff's inability to participate fully in chemical dependency treatment — Plaintiff has been removed from his treatment.   His removal may cause him to lack standing to pursue his religious discrimination lawsuit. As such, Plaintiff wishes to be returned to treatment as soon as possible to avoid the punishment associated with being removed from treatment, and to proceed with this lawsuit.

<u>See</u> Plaintiff's Memorandum of Law in Support of Temporary Restraining Order or Preliminary Injunction ("Pl.'s Mem."), p. 7.   In his Affidavit, Brooks stated that because he has been kicked out of treatment, he is concerned that he may not have standing for his lawsuit and that he will be locked in his room for 23 hours a day with the loss of eligibility for work release, boot camp, residency at a minimum-security facility and the loss of his right to attend religious ceremonies.   <u>See</u> Brooks Aff., ¶¶ 20, 23.   Defendants disagreed, arguing that if Brooks is not in treatment, he suffers no risk of irreparable harm, as he is an offender subject to the same MDOC rules as every other offender, including receiving consequences for his behavior.   <u>See</u> Defendants' Memorandum Opposing Motion for Temporary Restraining Order ("Defs.' Mem."), p. 6.   Additionally, defendants maintained that while Brooks speculated that he could be subjected to potential confinement to his cell, he submitted no evidence to support these statements.   <u>Id.</u> Further, they represented Brooks would not be subjected to confinement in his cell for 23 hours a day unless he did not participate in other prison programming such as holding a prison job or attending educational courses, or he incurred other disciplinary infractions. <u>Id.</u> (citing Hudson Decl., ¶ 6).   Defendants also claimed that the risk of harm is not irreparable.   According to defendants, Brooks has a significant amount of time left on his sentence, so if he were to ultimately prevail in this case, he could either re-enter treatment under his own terms or not participate in treatment.   <u>Id.</u>

This Court finds that Brooks has not met his burden of showing that he will suffer irreparable harm absent a restraining order.   First, as to Brooks' claims that he will be subjected to lockdown and that he may lose other benefits because he has been terminated from treatment, he has provided no admissible evidence to support this assertion.   <u>See</u> <u>Graham Webb Int'l v. Helene Curtis, Inc.,</u> 17 F. Supp.2d 919, 924 (D.

Minn. 1998) ("Possible or speculative harm is not enough.") (citing Gelco Corp, 811 F.2d at 418; Roberts v. Van Buren Public Schools, 731 F.2d 523, 526 (8th Cir. 1984)). Defendants represented that Brooks would not be subjected to confinement in his cell for 23 hours a day solely on the basis that he was not participating in treatment.   See Hudson Decl., ¶ 6.   While counsel for Brooks has communicated to this Court that Brooks has told them he was placed in lockdown solely due his termination from treatment, the Court cannot accept an unsworn statement through counsel as proof that MDOC did so only because he was terminated from treatment.

Second, while the Court acknowledges that Brooks could suffer harm because he may receive extra incarceration time for failing to complete treatment, such potential harm is not an irreparable harm that needs to be addressed by immediate injunctive relief. According to defendants, if a hearing officer finds an offender guilty of refusing to participate in treatment when he has received a treatment directive, the offender may face discipline for treatment refusal, with a maximum discipline of 360 days of extended incarceration and an extended period of supervised release.   See Hudson Decl., ¶ 5. However, according to Brooks, he still has approximately 48 months left on his 72-month sentence.   See Brooks Aff., ¶¶ 3, 4.   With over four years left in his incarceration, even if MDOC finds Brooks guilty of refusing to participate in treatment and gives him additional incarceration time for the violation, this suit will be terminated well before Brooks's sentence expires.   If he prevails in his suit, he will not have to serve the additional time.

Third and finally, this Court does not comprehend Brooks' concern that he may not be allowed to assert his legal claims if he is not returned to the treatment program. Based on this Court's understanding, Brooks wants to be restored to a treatment program that is allegedly infringing on his right to freedom of religion in order to maintain a claim for

injunctive relief.   Brooks is correct that generally, transfer from an offending institution can moot claims for declaratory or injunctive relief.[7]   See Pratt v. Corr. Corp. of Am., 267 Fed. Appx. 482, 2008 WL 612571 at *1 (8th Cir. 2008) (table decision) (concluding inmate's § 1983 claims for declaratory and injunctive relief were moot when he was transferred to another facility and was no longer subject to alleged unlawful conditions); Smith v. Hundley, 190 F.3d 852, 855 (8th Cir. 1999) (same).   However, as a part of his lawsuit, Brooks has requested that the Court enjoin defendants from disciplining him for his refusal to fully participate in the chemical dependency program.   This is the central focus of his action and is not moot at this time.   It is an issue that will require the parties, the Court and perhaps a jury to determine whether Brooks justifiably did not participate in the New Dimensions Program because it violated it his religious beliefs.   If the answer is yes, then defendants will not be allowed to discipline Brooks for not participating in treatment and this issue will not be resolved merely because he has been transferred out of the allegedly offending treatment program.

Based on Brooks's failure to show irreparable harm, his motion for injunctive relief should be denied.   See Adam-Mellang v. Apartment Search, Inc., 96 F.3d 297, 299 (8th Cir. 1996) ("the failure to show irreparable harm is, by itself, a sufficient ground upon which to deny a preliminary injunction.").

### B.   Likelihood of Success on the Merits

Brooks asserted that he is likely to succeed on the merits of his religious expression claims under the First Amendment, RLUIPA and Minnesota Constitution, Article I, § 16, and his AIRFA claim.   In addition, Brooks intimated that defendants retaliated against him due to the filing of the present lawsuit.   See Motion for Temporary

---

[7]     Indeed, Brooks is no longer subjected to the treatment that allegedly conflicted with his beliefs.

Restraining Order or Preliminary Injunction [Docket No. 16]; Pl.'s Mem., pp. 3-4.   For the reasons set forth in the analysis below, this Court finds that Brooks is not likely to succeed on the merits of any of these claims.[8]

### 1.   Religious Expression Claims under the First Amendment, RLUIPA and Minnesota Constitution, Article I, § 16

With regards to Brooks's freedom of expression claim, while it is true that confined individuals enjoy the right to freedom of religion, (see Cruz v. Beto, 405 U.S. 319, 322 (1972) (per curiam); Hamilton v. Schriro, 74 F.3d 1545, 1550 (8th Cir. 1996) (citation omitted)), "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests."   Turner v. Safley, 482 U.S. 78, 89 (1987); see Gladson v. Iowa Dept. of Corrections, 551 F.3d 825, 831 (8th Cir. 2009) ("While prisoners retain their constitutional rights, they are subject to limitations on those rights 'in light of the needs of the penal system.'") (quoting Murphy v. Mo. Dep't of Corr., 372 F.3d 979, 987 (8th Cir. 2004), cert. denied, 543 U.S. 991 (2004)). Stated otherwise, "[a]lthough prison authorities may regulate the exercise of religion for legitimate institutional needs, those authorities may not unreasonably interfere with the inmate's exercise of his beliefs."   Native American Council of Tribes v. Solem, 691 F.2d 382, 384-85 (8th Cir. 1982) (citing Proffitt v. Ciccone, 506 F.2d 1020, 1021 (8th Cir. 1974)).

In determining whether a prohibition on a constitutional right is reasonable in the context of a prison setting, a court is to consider four factors: (1) "whether there is a valid

---

[8]   The Court notes that presently pending are defendants' motion to dismiss for failure to state claims under the First Amendment, RLUIPA, Minnesota Constitution, Article I, § 16, and AIRFA.   See Docket No. 9.   This motion, along with defendants' motion for summary judgment, based on an alleged failure to exhaust available administrative remedies pursuant to the Prison Litigation Reform Act of 1995, are currently in the briefing stage.   See Docket No. 15 (Amended Order dated April 5, 2012).

rational connection between the prison regulation and the government interest in justifying it; (2) whether there is an alternative means available to the prison inmates to exercise the right; (3) whether an accommodation would have a significant ripple effect on the guards, other inmates, and prison resources; and (4) whether there is an alternative that fully accommodates the prisoner at de minimis cost to valid penological interests." Murphy, 372 F.3d at 982-83 (quoting Turner, 482 U.S. at 89-91 (internal quotations omitted).

Thus, "[i]n analyzing a Free Exercise claim, 'we consider first the threshold issue of whether the challenged governmental action infringes upon a sincerely held religious belief and then apply the Turner factors to determine if the regulation restricting the religious practice is reasonably related to legitimate penological objectives.'" Gladson, 551 F.3d at 831-32 (internal quotations and citations omitted)

On the other hand, "[a] prisoner's claim under RLUIPA is evaluated under a different standard than a First Amendment claim. 'By enacting RLUIPA, Congress established a statutory free exercise claim encompassing a higher standard of review than that which applies to constitutional free exercise claims.'" Gladson, 551 F.3d at 832 (quoting Murphy v. Mo. Dep't of Corr., 372 F.3d at 987).

RLUIPA provides in pertinent part:

(a) General rule

No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person—

(1) is in furtherance of a compelling governmental interest; and

(2) is the least restrictive means of furthering that compelling

governmental interest.

42. U.S.C. § 2000cc-1.

The statute defines religious exercise as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief."   42 U.S.C. § 2000cc-5(7)(A).

To constitute a substantial burden under RLUIPA, a prisoner must show that the government policy or actions "'significantly inhibit or constrain conduct or expression that manifests some central tenet of a person's individual religious beliefs; must meaningfully curtail a [person's] ability to express adherence to his or her faith; or must deny a person reasonable opportunities to engage in those activities that are fundamental to a person's religion.'"   Gladson, 551 F.3d at 832 (quoting Murphy, 372 F.3d at 988 (internal quotations, citations, and alterations omitted).[9]  "When the significance of a religious belief is not at issue, the same definition of 'substantial burden' applies under the Free Exercise Clause . . . and RLUIPA."   Id., (quoting Patel v. U.S. Bureau of Prisons, 515 F.3d 807, 813 (8th Cir. 2008)).

In summary, when addressing both Free Exercise Clause and RLUIPA claims, courts must first "inquire as to whether the prison has placed a 'substantial burden' on the prisoner's ability to practice his religion."   Gladson, 551 F.3d at 832 (citation omitted). Then, if it is determined that a regulation or policy imposes as substantial burden on a prisoner, the review of the burden under the Free Exercise Clause differs from that of RLUIPA.   Id. (citation omitted).   Conversely, "if the prisoner fails to put forth sufficient evidence that his ability to practice his religion has been substantially burdened, then the

---

[9]     In Gladson, the Eighth Circuit acknowledged that in light of Cutter v. Wilkinson, 544 U.S. 709, 725 (2005), "portions of the definition stated in Murphy requiring religious beliefs to be a 'central tenet' or 'fundamental' may not apply to a RLUIPA claim."   551 F.3d at 832-33 (quoting Patel, 515 F.3d at 813 n. 7) (internal quotations and alterations omitted).

court need not apply the Turner test to the Free Exercise claim and the strict scrutiny test to the RLUIPA claim."   Gladson, 551 F.3d at 833.

In any event, whether a court is analyzing a Free Exercise claim or a RLUIPA claim, a significant degree of deference is accorded to the expertise of prison officials in evaluating whether they met that burden.   Murphy, 372 F.3d at 987 (citations omitted). In fact, the legislative history of the predecessor to RLUIPA, the Religious Freedom Restoration Act ("RFRA"), which the Eighth Circuit has found is equally applicable to RLUIPA, states:

> [T]he committee expects that courts will continue the tradition of giving due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources.
>
> At the same time, however, inadequately formulated prison regulations and policies grounded on mere speculation, exaggerated fears, or post-hoc rationalizations will not suffice to meet the act's requirements.

Id. at 987-88 (quoting 156 Cong. Rec. S7775 (July 27, 2000)).[10]

The Minnesota Constitution, Article I, § 16[11] affords religious protections broader

---

[10]   RFRA was declared unconstitutional as applied to the states and localities in City of Boerne v. Flores, 521 U.S. 507 (1997) (holding that Congress had exceeded its authority by using its section five power under the Fourteenth Amendment to enact the statute).   See Murphy, 372 F. 3d at 987.   "In RLUIPA, Congress resurrected RFRA's language, but narrowed the scope of the act, limiting it to laws and regulations concerning institutionalized persons or land use."   Id. (citing 42 U.S.C. §§ 2000cc & 2000cc-1).

[11]   The Minnesota Constitution provides in relevant part:

> The enumeration of rights in this constitution shall not deny or impair others retained by and inherent in the people. The right of every man to worship God according to the dictates of his own conscience shall never be infringed; . . . nor shall any

than those contained in the federal constitution.   See State v. Hershberger, 462 N.W.2d 393, 397 (Minn. 1990).   The balancing test to determine if a state action infringes on a claimant's freedom of expression is essentially the same analysis undertaken with regards to a RLUIPA claim: "The courts ask if (a) the objector's belief is sincerely held; (b) the state regulation burdens the free exercise of religious beliefs; (c) the state interest in the regulation is compelling; and (d) the state regulation uses the least restrictive means to effectuate a compelling interest."[12]   Rooney v. Rooney, 669 N.W.2d 362, 369 (Minn.

---

control of or interference with the rights of conscience be permitted.

Minn. Const. art. I, § 16.

[12]    While defendants claimed that the Minnesota Constitution does not provide for a private remedy (see Defs.' Mem., p. 10), Minnesota case law suggests otherwise as it relates to Article I, § 16.   See e.g., Edina Community Lutheran Church v. State, 745 N.W.2d 194, 203 (Minn. Ct. App. 2008), rev. denied (Minn. Apr 29, 2008) (upholding the grant of injunctive relief against the state based on a challenge to a state statute under Article I, § 16); In re Giishig, No. A08-0010, 2008 WL 5058537 at *2-3 (Minn. Ct. App. Dec. 2, 2008) (remanding to the district court to determine whether the decision of the county to deny a name change that was allegedly an expression of Native American religious beliefs, violated the applicant's religious liberty under Article I, § 16) (citing Hill-Murray, 487 N.W.2d at 865); Rooney, 669 N.W.2d at 369 (respondent argued that the state withholding statute compromised the church's faith, hindered religious practice and required the church to act contrary to its doctrine, however, the court appeals decided that the statute did not violated Article I, § 16 based on the analysis set forth in Hill-Murray, supra.)   The Court acknowledges that at least one court in this district has concluded Minnesota Constitution does not afford a private cause of action, however, the cases relied upon by the court for that proposition do not address Article I, § 16. See Jihad v. Fabian, NO. CIV. 09-CV-1604 (SRN/LIB), 2011 WL 1641767 at *3 (D. Minn. May 02, 2011), adopting 2011 WL 1641885 at *8.   Further, other courts within this district have suggested that Article I, § 16 does afford a private remedy.   See, e.g., American Civil Liberties Union of Minnesota v. Tarek ibn, 788 F. Supp.2d 950, 957 (D. Minn. 2011) (finding that private parties have the right to assert challenges under the Minnesota Establishment Clause, Minn. Const. art. I, § 16); Jihad v. Fabian, 680 F. Supp.2d 1021, 1043 (D. Minn. Jan. 21, 2010) ("In a test which mirrors the RLUIPA standard, the Minnesota Supreme Court has held that the clause prohibits the State Government from placing excessive burdens on sincerely-held religious beliefs, without a compelling justification, and use of the least restrictive means. For the reasons we detailed in our discussion of the Plaintiff's RLUIPA claims, his claims most likely fail under the Minnesota Constitution, for lack of a substantial burden, or because of the

Ct. App. 2003), rev. denied (Minn. Nov 25, 2003), cert. denied 541 U.S. 1011 (2004) (citing Hill–Murray Fed'n of Teachers v. Hill–Murray High Sch., 487 N.W.2d 857, 865 (Minn. 1992)).

In this case, Brooks argued that consistent with his Native American religious beliefs, "effective treatment for chemical dependency requires an individual to discover the underlying causes of addiction and to remedy them by pursuing a path back to health. For a Native American that may include cleansing ceremonies such as pipe and smudge ceremonies and sweat lodge ceremonies." See Pl.'s Mem., p. 10.   According to Brooks, his faith "demands a different perspective on chemical dependency, and an awareness of the personal, social, and cultural context in which the alcohol and drug abuse occur.   To benefit from the chemical dependency treatment, Plaintiff must approach the problem from a Native American perspective, which requires taking responsibility for one's choices and addressing the underlying causes of substance abuse." Id., pp. 12-13.   Brooks went so far as to allege defendants' program includes a religious component, modeled on the twelve-step program of Alcoholics Anonymous.   Id., p. 11.   Brooks has relied on the Mash-ka-wisen Treatment Program as a model program, which he asserts is consistent with his beliefs.   Id., pp. 11, 14.

This Court finds that Brooks is not likely to succeed on his freedom of expression, RLUIPA and Minnesota Constitution claims.

Assuming for the purpose of this motion that Brooks's religious beliefs are sincerely held, [13] Brooks has offered no support for his assertions that the New

overriding compelling State interests. Therefore, the Plaintiff has shown neither a likelihood of success on the merits, nor irreparable harm in relation to his claims under the Minnesota Constitution.") (internal citations omitted).

[13]   The Court observes that Brooks has offered no evidence of the religious beliefs espoused by Native Americans that are allegedly impinged by the New Dimensions

Dimensions Program substantially burdens his faith.   For starters, there is no evidence that the New Dimensions Program incorporates any religious beliefs into its chemical dependency program.   See Nemecska Aff., ¶ 13.   Further, although program inmates are encouraged to engage in pro-social activities, which can include Alcoholics Anonymous (along with Alternative to Violence and Restorative Justice), Brooks was told that his participation in Native American activities offered at MCF-Faribault such as smudging, drum group and sweat lodge were regarded as pro-social activities.   Id.; see also Nemecska Aff., Ex. 3, p. 3 (according to staff, Brooks "would benefit from developing pro-social networks that strongly support the Native American Culture. . . ."). In fact, Brooks admitted that "[w]hile I was in chemical dependency treatment, I had the following opportunities: Pipe and smudge on Mondays, Wednesdays and Fridays, drum group Saturday and sweat lodge on Sunday."   Brooks Aff., ¶ 19, Exs. H, I.   Additionally, to the extent that Brooks believed that he needed to approach his chemical dependency from a Native American perspective, staff told Brooks that he could start a Native American support group and that materials were available for him to start such a group, but he declined to do so.   See Brooks Aff., Ex. E, p. 2; see also Nemecska Aff., ¶ 13.   Brooks also refused to look at as part of his treatment planning, a twenty-two module resource book offered during a three-day training on Native American Curriculum for State-licensed, Substance Abuse Programs in Minnesota.   Id., ¶ 14.   The New Dimensions Program staff even provided Brooks a blank treatment plan to complete to create his own cultural specific treatment and informed him that they would merge this

---

Treatment Program.   Nevertheless, at this juncture, the Court does not reach this issue because defendants have not contested the sincerity of Brooks' religious beliefs and generally whether or not an asserted belief constitutes "a sincerely held religious belief is a factual determination."   Murphy, 372 F.3d at 983.

treatment plan into the MDOC treatment plan expectations.   See Nemecska Aff., Ex. 4, p. 1.   However, Brooks failed to avail himself of this opportunity.

Brooks stated that his faith mandates that effective treatment requires an individual to discover the underlying causes of the addiction and to remedy them.   See Pl.'s Mem., p. 10.   Yet there is no indication that the New Dimensions Program does not explore underlying causes.   See Nemecska Aff., ¶ 5.   To the contrary, the intake assessment for Brooks asked questions regarding his family situation and family dynamics, his medical history (including mental history), his social contacts, cultural background, and employment history.   See Nemecska Aff., Ex. 2.   Yet, Brooks refused to answer many of these questions.   Id.

At the end of the day, except for assertions in the supporting memorandum of law that the New Dimensions Program was modeled after a twelve-step program, Brooks has not pointed this Court to any aspect of the program that violates, much less substantially burdens his sincerely held beliefs of the Native American religion.   Rather, the evidence before this Court suggests the opposite – that the Program is designed to incorporate and support his beliefs.   On this basis, Court finds that Brooks is not likely to succeed on the merits of his freedom of expression, RLUIPA and Minnesota Constitution, Article I, § 16 claims, as he cannot establish a substantial burden on his religious beliefs.

Moreover, even if Brooks established that the New Dimensions Program created a substantial burden on his religious beliefs, inmate rehabilitation is a legitimate and compelling penological interest.   See Fegans v. Norris, 537 F.3d 897, 902 (8th Cir. 2008); Dawson v. Scurr, 986 F.2d 257, 260 (8th Cir. 1993).   There is no dispute in this case that Brooks has a history of criminal activity that stems from his chemical

dependency.   Treatment for Brooks' chemical dependency amounts to a compelling governmental interest.

As for the alternatives, Brooks pointed this Court to the Mash-ka-wisen Treatment Program located in Sawyer, Minnesota.   According to Mash-ka-wisen's website, its treatment program entails the following:

> Individual Treatment Plans:   The counseling team works with the primary counselor in developing an individual treatment plan to assist the client in their recovery efforts.   The individual treatment plan is adjusted as needed to meet the needs of the client during their treatment stay.
>
> Treatment Program:   Mash-ka-wisen has developed a basic treatment program to compliment the individual plan.   This program consists of group therapy, lectures, self directed study time and exposure to Alcoholics Anonymous and Narcotics Anonymous.   We take a holistic approach to treatment incorporating the Twelve Steps of Alcoholics Anonymous, current understanding of addiction, mental health services and the use of Native American Tradition and Culture.   Clients are invited to participate in numerous ceremonies and rituals during their treatment stay.

http://www.mashkawisen.com/Program%20Information.htm   (last   visited   5/01/12) (emphasis added).

Based on the website, it is not clear to this Court why Brooks believes that the Mash-ka-wisen Treatment Program presents a viable alternative to the New Dimensions Program.   First, unlike the New Dimensions Program, it appears to require exposure to the very same twelve-step program that Brooks claims is antithetical to his religious beliefs.   Second, even if the Mash-ka-wisen Treatment Program was the perfect treatment program, there is no indication that it is equipped to handle an incarcerated felon.   In any event, "[a] prisoner need not be afforded his preferred means of practicing his religion as long as he is afforded sufficient means to do so."   Gladson, 551 F.3d at 831 (quoting Murphy, 372 F.3d at 983).   Third, requiring MDOC staff to both accompany

and transfer Brooks back and forth each day from Faribault to Sawyer, Minnesota, a distance of approximately 190 miles and entailing three hours each way, is not a viable accommodation.   It clearly places undue burden on prison personnel, other inmates, and prison resources, and the cost of such an accommodation is not de minimus.   Finally, Brooks has not satisfied this Court that the very components that he believes the Mash-ka-wisen Treatment Program offers cannot be incorporated into the New Dimensions Program.

Based on the current record, the Court finds Brooks was given the opportunity to tailor a program incorporating his Native American beliefs and practices into his chemical dependency treatment with the New Dimensions Program, but for whatever reason, he has chosen not to do so.   For all of the reasons stated above, the Court finds that Brooks is not likely to prevail on his First Amendment freedom of expression, RLUIPA and Minnesota Constitution, Article I, § 16 claims.

### 2.    American Indian Religious Freedom Act Claim

Brooks claimed that defendants violated his right to free expression under AIRFA, 42 U.S.C. § 1996.   See Pl.'s Mem., p. 9.   Defendants argued that Brooks' claim under the AIRFA claim is not likely to succeed because the Act does not provide for a private cause of action.   See Defs.' Mem. at p. 10.   The Court agrees.

AIFRA, a joint resolution of Congress, provides:

> On and after August 11, 1978, it shall be the policy of the United States to protect and preserve for American Indians their inherent right of freedom to believe, express, and exercise the traditional religions of the American Indian, Eskimo, Aleut, and Native Hawaiians, including but not limited to access to sites, use and possession of sacred objects, and the freedom to worship through ceremonials and traditional rites.

42 U.S.C. § 1996.

There is no private cause of action under AIRFA, as it does not provide for individual judicially-enforceable rights.   See Lyng v. Northwest Indian Cemetery Protective Ass'n, 485 U.S. 439, 455 (1988); see also Henderson v. Terhune, 379 F.3d 709, 715 (9th Cir. 2004) ("AIRFA is simply a policy statement that is judicially unenforceable.") (citation omitted); Lockhart v. Kenops, 927 F.2d 1028, 1036 (8th Cir. 1991) ("AIRFA is merely a statement of federal policy to protect Indians' exercise of their religion; it confers no cause of action.") (citation omitted).   Therefore, given that AIFRA does not afford Brooks individual judicially-enforceable rights, his request for injunctive relief under this Act is not likely to succeed on the merits.

### 3.   Retaliation

According to Brooks, he has suffered retaliation for bringing the present lawsuit. See Pl.'s Mem., p. 3.   In particular, Brooks asserted that his placement on a Behavior Contract, his subsequent placement on a Probation Contract, and ultimate removal from the New Dimensions Program, despite his best attempts to comply with the program's rules, amounted to retaliation for exercising his rights before this Court. Id., pp. 3-4. Defendants countered that any such claim should not be considered, as it was never briefed as part of Brooks' argument and his Complaint contains no such claim. See Defs.' Mem., p. 8.   In addition, defendants asserted that Brooks failed to submit any evidence in support of his claim for retaliation -- specifically that the actions taken against him were the "but for" cause of his termination from treatment.   Id., p. 9.

In order to sustain a retaliation claim, a prisoner must show that the primary purpose of a defendant's alleged retaliatory action was to punish the prisoner for attempting to exercise his constitutional rights.   As explained by the Eighth Circuit, "[t]o succeed on a claim of retaliatory transfer or retaliatory discipline, an inmate must prove

that, but for an unconstitutional retaliatory motive, the transfer or discipline would not have occurred." Johnson v. Esry, No. 98-2573, 2000 WL 375269 at *1 (8th Cir. 2000) (per curiam). Thus, the prisoner must show that he would not have suffered the alleged retaliatory mistreatment at issue "but for" the defendant's retaliatory motive. See Kind v. Frank, 329 F.3d 979, 981 (8th Cir. 2003) (prisoner's retaliation claim was properly dismissed where he "failed to show that but for his assertions of his constitutional rights, he would not have been transferred"); Sisneros v. Nix, 95 F.3d 749, 752 (8th Cir.1996) ("[i]n a retaliatory transfer case, 'the burden is on the prisoner to prove that but for an unconstitutional, retaliatory motive the transfer would have not occurred'") (quoting Goff, 7 F.3d at 738); Hazen v. Reagen, 16 F.3d 921, 926 (8th Cir. 1994) ("for an inmate to prove that his transfer was in retaliation for the exercise of First Amendment rights, he must establish that he would not have been transferred 'but for' the retaliatory reason").

It is true that Brooks has not alleged a claim of retaliation in his Complaint. However, assuming that he were to amend the Complaint and assert such a claim, the evidence in the record shows that the Behavior Contract and Probation Contract were put in place based on Brooks' continuing resistance to treatment and not following the program's rules. The uncontested evidence indicates that Brooks refused to believe in addiction or sobriety, failed to advance from the pre-contemplation stage of his therapy, refused to complete his assignments, interfered with group therapy, condoned the negative behavior of one of his peers, told staff that they could not be in the same room as him, displayed a negative attitude towards treatment, and attempted to split staff in order to avoid following the rules and to countermand his therapist's instructions. In sum, the record supports defendants' contention that Brooks was ultimately terminated from the program because he failed to meet the requirements of the Probation Contract and due to

staff splitting behaviors.   On this record, the Court cannot find that Brooks would not have been terminated from the New Dimensions Program, <u>but for</u> his petitioning to the Court for relief.    As such, the Court finds that Brooks is not likely to succeed on the merits of a retaliatory transfer claim.

## C.   <u>Balance of the Harms and Public Interest</u>

Brooks has not provided sufficient evidence that he is being precluded from practicing his religion or that the New Dimensions Program constituted a substantial burden to his beliefs.   On the other hand, given his criminal and substance abuse history, allowing Brooks to circumvent the treatment program, requiring MDOC to transport him daily to a program three hours away from FMC-Faribault, or permitting Brooks to dictate every aspect of his mandated treatment would constitute a dangerous intrusion by the Court into prison administration.   Such court interference could negatively impact prison safety and resources, and lead to the non-rehabilitation of Brooks, all of which is not in the public interest.   Thus, the Court finds that the balance of the harms and public interest weigh in favor of denying his request for injunctive relief.

## D.   <u>Conclusion</u>

In conclusion, based on the <u>Dataphase</u> factors set forth above, this Court finds that Brooks' motion for a TRO or a preliminary injunction should be denied.

## V.    <u>RECOMMENDATION</u>

For the reasons set forth above, it is recommended that:

Plaintiff's Motion for Temporary Restraining Order or Preliminary Injunction [Docket No. 16] be **DENIED**.

Dated:       May 4, 2012              s/ *Janie S. Mayeron*
                                      JANIE S. MAYERON
                                      United States Magistrate Judge

## **NOTICE**

Under D.Minn. LR 72.2(b) any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **May 18, 2012**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.   A party may respond to the objecting party's brief within ten days after service thereof.   All briefs filed under this Rules shall be limited to 3500 words. A judge shall make a de novo determination of those portions to which objection is made. This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable directly to the Circuit Court of Appeals.

Unless the parties stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this Report and Recommendations, the party making the objections shall timely order and file a complete transcript of the hearing on or before **May 18, 2012**.